IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RUDY RICE,                              *
                                        *
            Plaintiff,                  *
                                        *
    vs.                                 *        Civil Action No.  ADC-16-3498
                                        *
HOWARD COUNTY GOVERNMENT,               *
                                        *
            Defendant.                  *
                                        *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM OPINION**

Defendant, Howard County, Maryland ("Defendant"), moves this Court for summary

judgment in favor of Defendant and against Plaintiff Rudy Rice ("Plaintiff") (the "Motion")

(ECF No. 45). Defendant seeks a ruling from the Court that Plaintiff cannot prevail on his

hostile work environment discrimination and retaliation claims against Defendant, his former

employer, because he cannot demonstrate required elements of these claims. ECF No. 45-1 at 1–

2. Plaintiff filed an opposition to Defendant's Motion (ECF No. 46). After considering the

Motion and responses thereto (ECF Nos. 46–47), the Court finds that no hearing is necessary.

*See* Loc.R. 105.6 (D.Md. 2016). In addition, having reviewed the pleadings of record and all

competent and admissible evidence submitted by the parties, the Court finds that there is

insufficient evidence from which a jury could find in Plaintiff's favor on the hostile work

environment claims, and insufficient evidence from which a jury could find in Plaintiff's favor

on the retaliation claim. Accordingly, the Court will GRANT Defendant's Motion (ECF No.

45).

1

This lawsuit arises out of Plaintiff's allegations of hostile work environment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Maryland Human Relations Act ("MHRA"). The facts are viewed in a light most favorable to Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Plaintiff, an African-American, worked at the Howard County Bureau of Water and Wastewater Utilities (the "Bureau"). Defendant's Workplace Harassment Policy explains the informal and formal procedures for reporting harassment complaints:

COMPLAINTS

- Informal Procedure
  The County encourages individuals who believe they are being harassed ("Reporting Individual(s)") to directly and promptly notify the harasser or offender that his or her behavior is unwelcome. If for any reason a Reporting Individual does not wish to approach the harasser or offender directly, or if such discussion does not successfully end the harassment, the Reporting Individual should notify either the Human Resources Administrator or any Human Resources professional, the Appointing Authority for his/her department, or his/her supervisor, for purposes of speaking with the alleged harasser. While this informal procedure is encouraged, it is not a required first step for a Reporting Individual wishing to report an incident of harassment using the formal complaint procedure outlined below. If the Human Resources Administrator, or the Reporting Individual's Appointing Authority or supervisor is successful in informally resolving a report of harassment, a written report summarizing the complaint made and resolution achieved shall be promptly forwarded to and maintained by the Human Resources Administrator.

- Formal Procedure

  In the event that a Reporting Individual does not wish to pursue the informal procedure described above, or in the event that the informal procedure does not produce a result satisfactory to a Reporting Individual, the following steps should be followed to report the harassment complaint:

  1. A Reporting Individual who believes he or she has been subjected to harassment should promptly report the incident to the Human Resources Administrator or his/her designee.

  2. A Reporting Individual also has the option of reporting an incident of harassment to the Reporting Individual's Appointing Authority, or the individual's immediate supervisor. When a report of harassment is made to either an Appointing Authority or supervisor, the Appointing Authority or supervisor must immediately file with the Human Resources Administrator a written report of the complaint, as the Office of Human Resources is responsible for overseeing harassment investigations.

  3. All complaints of harassment must be reduced to writing by either the Reporting Individual or the individuals designated above who are authorized to receive complaints. The written Complaint is to contain a detailed record or account of the behavior found objectionable, and shall be signed by the Reporting Individual.

  4. The prompt reporting of harassment complaints is strongly encouraged by the County. While the County will investigate all complaints of harassment, the late reporting of complaints or information may affect the County's ability to conduct a thorough investigation, and may thereby impair the County's ability to take effective remedial action. Additionally, and while the County has chosen not to impose a specific time frame in which to report harassment complaints, a Reporting Individual should be aware that applicable statutes of limitation may constrain the time for instituting outside legal action.

ECF No. 45-10 at 2–4. The policy also includes information about the investigative process for complaints, including listing steps for ordinarily investigating complaints, resolving complaints, and disciplining individuals found to have engaged in misconduct constituting harassment under the policy. *Id.* at 4–5. Furthermore, the policy lays out categories for immediate discharge of an employee, including insubordination, which includes "a failure or refusal to follow directions or to perform assigned work." ECF No. 46-12 at 6–7.

Plaintiff worked in the main office of the administrative building at the Little Patuxent Water Reclamation Plant ("LPWRP"). ECF No. 45-5 at 5. Maria Madison, an African-American, was Plaintiff's immediate supervisor and she evaluated Plaintiff, with the approval of her supervisor, the Bureau Chief, Stephen Gerwin. ECF Nos. 45-3 at 2–5 & 45-4 at 2. Ms. Madison and Mr. Gerwin worked at a different location than Plaintiff. ECF No. 45-3 at 2. Plaintiff's office included Paul Tomaskovic, a superintendent for the operational side of LPWRP, Denis Junis, another timekeeper, and a woman who sat at the front desk. ECF Nos. 45-3 at 22 & 45-5 at 3, 5–6. Plaintiff was the only African-American in the main office area. ECF No. 45-5 at 5–6.

As an Administrative Technician III, Plaintiff's responsibilities included timekeeping and submitting payroll for LPWRP. ECF No. 45-3 at 2, 16. Plaintiff, as well as other LPWRP employees, received direction and assignments from Mr. Tomaskovic and other LPWRP superintendents. ECF No. 46-5 at 5, 9. Specifically, Plaintiff administratively supported Mr. Tomaskovic and other LPWRP superintendents by doing payroll for their personnel. ECF No. 46-3 at 5. As a result, Plaintiff had a "significant amount" of contact with other employees in performing his duties. ECF No. 45-4 at 7.\

## A. The Offending Comments

On May 20, 2014, Mr. Tomaskovic said, "Rudy, I swear to fucking God, if you have that heater on, I am going to kick your black ass." ECF No. 45-6 at 8. Mr. Tomaskovic repeated the comment at Mr. Rice's request and Mr. Rice said something to the effect of "You can try." *Id.* Mr. Tomaskovic made another comment under his breath and then went to his office. *Id.*

Shortly thereafter, Plaintiff informed Ms. Madison of this incident with Mr. Tomaskovic. ECF No. 45-3 at 9. Plaintiff told Ms. Madison that the tone of Mr. Tomaskovic's voice led him to believe that Mr. Tomaskovic would escalate the incident to a physical altercation. ECF No. 45-5 at 6. Plaintiff also told Ms. Madison about two other incidents involving Mr. Tomaskovic: (1) in early March 2014, Mr. Tomaskovic said to a coworker's dog, Jade, "[L]ook out Jade, there is a black man coming;" and (2) on February 25, 2014, Mr. Tomaskovic told Plaintiff that instead of hiring him, he wanted to "hire this smoking hot, white young lady." ECF No. 45-6 at 9. Plaintiff had not previously reported these incidents and said that he had ignored them when they were made. *Id.* Plaintiff further told Ms. Madison about three earlier incidents involving Ms. Junis: (1) that in March 2014, Ms. Junis shouted that "black people don't look good in camouflage;" (2) that Ms. Junis shouted at Plaintiff that "black people don't celebrate Saint Patrick's Day;" and (3) that in April 2014, Ms. Junis said to Plaintiff, "Rudy, since the power is out, I cannot see you; you are too black."[1] ECF No. 45-5 at 5. None of these instances were physically threatening. ECF No. 45-3 at 26. Once he finished his report on May 20, Plaintiff asked to leave work for the rest of the day because he felt "disgusted by the whole situation" and was afraid for his safety. *Id.* at 10.

---

[1] Plaintiff had not told Ms. Madison about these statements before May 20, 2014 and they were not included in Plaintiff's subsequent harassment complaint which was submitted to HR. *See* ECF No. 46-5 at 22–23.

Ms. Madison immediately reported the incident to Mr. Gerwin and Mr. Gerwin notified Human Resources ("HR"). ECF No. 45-4 at 4, 6. Because Plaintiff did not want to return to LPWRP, he also took off from work on May 21. ECF No. 45-3 at 10. Ms. Madison called Plaintiff at his home and told him that pending the investigation into his complaint, he would report to the Bureau's headquarters on Old Montgomery Road. ECF Nos. 45-3 at 12 & 45-5 at 9.

**B. Defendant's Investigations**

When Plaintiff returned to work on May 22, 2014 at Old Montgomery Road, he was asked to submit a written harassment complaint against Mr. Tomaskovic to Ms. Madison and Mr. Gerwin. ECF No. 45-3 at 10–12; *see also* ECF No. 46-5 at 16–17. Ms. Madison and Mr. Gerwin reviewed Plaintiff's written complaint and revised it, offering edits, *see* ECF No. 46-5 at 20–21, which Plaintiff accepted before the complaint was submitted to HR on May 27, 2014, ECF No. 45-3 at 11; *see* ECF No. 46-3 at 35–36.

At Old Montgomery Road, Plaintiff was assigned a desk without a computer. ECF No. 45-3 at 12. During the next two weeks while Plaintiff did not have a computer, Mr. Gerwin directed Plaintiff to take pictures of work crews at their sites. *Id.* at 5. In order to do so, Plaintiff's start time was changed to an hour earlier.[2] ECF No. 46-3 at 23. Also during this time, Plaintiff performed his timekeeper job duties by using other employees' computers while they were at lunch or off from work and by asking other employees if he could use their computers. ECF No. 45-3 at 13. Plaintiff eventually moved his own computer at night and received overtime pay for doing so. *Id.*

---

[2] Plaintiff's start time had also changed prior to his complaint against Mr. Tomaskovic in order to accommodate another employee's school schedule. ECF No. 46-3 at 16.

While Plaintiff was working from Old Montgomery Road, other administrative assistants handled Plaintiff's responsibilities which had to be performed at LPWRP, including transporting confidential documents regarding payroll to Plaintiff at Old Montgomery Road. ECF Nos. 45-4 at 8 & 45-5 at 9–10. Also during this time, Plaintiff communicated with Mr. Tomaskovic by email, mostly through Ms. Madison. ECF No. 45-3 at 23. There were attempts to switch personnel between LPWRP and Old Montgomery Road so that Plaintiff could stay at Old Montgomery Road and to move Plaintiff to a trailer office at LPWRP, but these plans were rejected because other employees expressed disapproval. ECF Nos. 45-6 at 6 & 46-3 at 16–17.

Dr. Jo Ellen Gray, the Senior HR Administrative Analyst and an African-American, investigated Plaintiff's complaint. *Id.* at 3. As part of Dr. Gray's investigation, on May 28, 2014, Mr. Gerwin and Dr. Gray obtained statements from Plaintiff and Mr. Tomaskovic. *Id.* at 8. Within the next week, Mr. Gerwin and Dr. Gray also interviewed three other employees with knowledge of the facts relevant to Plaintiff's complaint. ECF No. 46-6 at 7. As a result of her investigation, Dr. Gray "determined that Mr. Tomaskovic did not violate the County's workplace harassment policy; however, his comment to Mr. Rice was offensive and demeaning and warrants disciplinary action." ECF No. 45-6 at 8. On June 3, 2014, Mr. Tomaskovic was suspended for five days without pay. ECF No. 46-13 at 2–4.

In or around mid-June, Plaintiff alleges that he found "a picture of a noose and the 'N' word on a napkin" in his desk drawer at Old Montgomery Road. ECF No. 46-3 at 23. Plaintiff threw this napkin away without showing it to anyone. *Id.* at 28. Plaintiff spoke to Dr. Gray about the note, ECF No. 45-3 at 24. Dr. Gray testified in deposition that she did not remember Plaintiff mentioning a napkin note and there is no mention of it in any report.

On June 16, 2014,[3] Dr. Gray produced her final written report regarding her investigation to Lonnie Robbins, the Bureau's Chief Administrative Officer. ECF No. 45-6 at 8. In her report, Dr. Gray summarized her interviews, which raised doubts regarding whether Mr. Tomaskovic's alleged statements were racially motivated, and concluded that Mr. Tomaskovic's racially insensitive remark did not constitute workplace harassment as defined in Defendant's Workplace Harassment Policy. *Id.* at 11. Specifically, Dr. Gray determined that the alleged behavior was not severe, extensive, or widespread enough to substantiate a violation of the workplace harassment policy by Mr. Tomaskovic. *Id.* at 12. Dr. Gray, however, found Mr. Tomaskovic's remark to be racially insensitive, demeaning, and inappropriate for the workplace, which she recommended warranted a five day suspension without pay. *Id.*

Mr. Gerwin sought to set up a meeting between Plaintiff and Mr. Tomaskovic so that Mr. Tomaskovic could apologize to Plaintiff. On July 18, 2014, Plaintiff refused to meet with Mr. Tomaskovic and expressed his displeasure over Mr. Gerwin scheduling a meeting without informing Plaintiff of Mr. Tomaskovic's presence. ECF No. 45-5 at 13.

Sometime during late summer, Mr. Gerwin determined that having a timekeeper who was not located at LPWRP was not working. ECF No. 45-4 at 9. Thus, he decided that Plaintiff could not stay at Old Montgomery Road. *Id.* Mr. Gerwin and Ms. Madison informed Plaintiff that his computer would be moved back to LPWRP on August 26, 2014. ECF No. 45-3 at 14. Plaintiff informed Ms. Madison that August 26 was in the middle of payroll and that a move on that day would interfere with his ability to complete payroll. *Id.* Thus, the move did not occur on August 26. *Id.* at 14–15.

---

[3] During the investigation, on June 5, 2014, Mr. Gerwin and Ms. Madison visited Plaintiff's house because Mr. Gerwin was concerned that Plaintiff had not reported for work and was not answering any of his communication devices. ECF No. 46-4 at 5–6. After this visit, Plaintiff returned to work.

8

On August 28, 2014, Plaintiff met with Mr. Robbins, Nancy Gray, the Deputy County Administrative Officer, and a union representative and he told them about his situation at LPWRP. ECF No. 45-8 at 3. Specifically, Plaintiff told them that he felt that he was being retaliated against by Ms. Madison and Mr. Gerwin because he thought that they were both trying to force him to accept Mr. Tomaskovic's apology. *Id.* Plaintiff also expressed safety concerns regarding his return to LPWRP. ECF No. 45-3 at 17.

After this meeting, Ms. Gray became aware of an opening for an Administrative Technician II position at a third Bureau location and discussed the possibility of Plaintiff transitioning into that similar job with Mr. Robbins. ECF No. 46-7 at 4. Because Plaintiff was at a higher grade—Administrative Technician III—than this position, Mr. Robbins and Ms. Gray decided to not downgrade Plaintiff if he filled this position. *Id.* at 5. Mr. Robbins and Ms. Gray discussed the possibility of offering Plaintiff an interview for the Administrative Technician II position and decided to do so. *Id.* Thus, at a subsequent meeting between Mr. Robbins, Ms. Gray, a union representative, and Plaintiff, Mr. Robbins offered Plaintiff an interview for the Administrative Technician II position at the third location.[4] ECF Nos. 45-3 at 16 & 45-4 at 16 & 45-8 at 3. After the meeting, Ms. Gray reiterated this offer with Plaintiff during a phone call. ECF No. 45-8 at 3–4. Plaintiff expressed that he was not interested in interviewing for the position. ECF No. 45-4 at 16. Ms. Gray relayed Plaintiff's disinterest to Mr. Gerwin and others. ECF No. 46-7 at 7.

On September 16, 2014, Plaintiff made a harassment claim against Ms. Madison for attempting to direct work flow concerning the FMLA, an area of his responsibility. ECF No. 45-

---

[4] Plaintiff could not remember whether Mr. Robbins or Ms. Gray mentioned upgrading the position. ECF No. 45-3 at 16. Mr. Robbins and Ms. Gray, however, remember telling Plaintiff that this position would be upgraded so that he would be laterally transferred from his current position. ECF Nos. 45-7 at 5 & 45-8 at 3 & 45-9 at 2.

9

4 at 15. While reporting this claim to Mr. Gerwin, Plaintiff also expressed issues with Mr. Gerwin, stating, "and I know you hate me Mr. Gerwin," and another timekeeper, JoAnne Hobbs. *Id.* Mr. Gerwin emailed HR regarding Plaintiff's complaint and Dr. Gray began a second investigation. ECF No. 45-6 at 25. The next day, Mr. Gerwin informed Plaintiff that he would be Plaintiff's direct supervisor until further notice and expressed a willingness to assist Plaintiff with preparing payroll. ECF No. 45-4 at 17. Plaintiff also understood that he would remain at Old Montgomery Road until the completion of the investigation into his allegations. ECF No. 46-3 at 19.

On September 24, 2014, Plaintiff met with Dr. Gray, an HR supervisor, a union representative, and an attorney for the union to discuss his allegations that he was being retaliated against by Ms. Madison and Mr. Gerwin. ECF No. 45-6 at 25. During this meeting, Plaintiff expressed that he felt retaliated against because of multiple schedule charges and "impromptu meetings, being pulled and paraded around and escorted in and out of rooms" with Ms. Madison and Mr. Gerwin as well as "being yelled at during those meetings and . . . trying to be forced to accept Mr. Tomaskovic's apology." ECF No. 46-3 at 19. During Dr. Gray's investigation into this retaliation complaint, she interviewed seven people, including Plaintiff, Ms. Madison, and Mr. Gerwin. ECF No. 45-6 at 25. In addition, as Plaintiff requested, an outside consultant also investigated Plaintiff's complaint against Ms. Madison. ECF No. 46-3 at 19, 40.

On October 20, 2014, Dr. Gray submitted an investigation report for Plaintiff's retaliation complaint. ECF No. 45-6 at 24. In her report, Dr. Gray found "no evidence that Ms. Madison or Mr. Gerwin retaliated against [Plaintiff] for filing a workplace harassment complaint against Mr.

Tomaskovic." *Id.* at 32. Dr. Gray also recognized the issues with having an off-site timekeeper and recommended that Plaintiff be transferred to another location. *Id.* at 33.

At a meeting on November 4, 2014, Mr. Gerwin told Plaintiff that he was to begin reporting to LPWRP at a different building that before, rather than Old Montgomery Road. ECF No. 45-3 at 18, 22. Plaintiff "reiterated [his] safety concerns and [his] anxiety for going back and working around [Mr.] Tomaskovic and that [he] would not be going back to [LPWRP] for safety reason."[5] *Id.* at 18. Plaintiff told Mr. Gerwin to "please forward me the termination papers." *Id.* at 28.

Following the meeting, Plaintiff and Mr. Gerwin exchanged emails using their Howard County email addresses. Mr. Gerwin expressed his expectation that Plaintiff would report for work at the different building at LPWRP:

> You stated in our meeting that you do not feel safe working for [Mr. Tomaskovic]. As you know, however, the County has thoroughly investigated your concerns and has determined that it is safe and appropriate for you to return to the plant. I also want to point out that you will not be reporting directly to, nor will you be working in the same building with [Mr. Tomaskovic].

*Id.* at 19, 30–31. Plaintiff responded that he would not report to LPWRP and that he "would like to have [a] copy of me being written up, for insubordination, as well as being terminated." *Id.* at 30.

On November 5, 2014, Plaintiff received an email from Mr. Gerwin and responded from his personal email address, saying that he was calling out sick and requesting that he be placed on leave until he received his termination paperwork. ECF Nos. 45-3 at 20, 32 & 46-3 at 21. Mr. Gerwin did not hear from Plaintiff again. ECF No. 45-3 at 32. Plaintiff did not receive any

---

[5] According to Plaintiff, even though he would be in a different building from Mr. Tomaskovic at LPWRP, he would still interact with Mr. Tomaskovic and "see him basically every day" because of his payroll duties. ECF No. 45-3 at 22–23.

communications from HR after November 4, except that he received FMLA paperwork in the mail. *Id.* at 21.

Mr. Gerwin emailed Plaintiff at his Howard County email address on November 10, 2014 to remind him that Howard County policy required Plaintiff to inform his supervisor each day that he would be out on leave. *Id.* at 32. Plaintiff did not see Mr. Gerwin's November 10 email because he did not have access to his Howard County email address while at home. ECF No. 45-4 at 12.

In a letter dated November 13, 2014, James Irwin, the Director of the Department of Public Works informed Plaintiff of his termination "as a result of [his] absence from work without authorization." ECF No. 45-3 at 32. Section 1.115 of the Howard County Code and the Howard County Employment Manual permit an appointing authority to immediately dismiss a County merit employee for cause for misconduct, which includes unauthorized absences. ECF No. 45-7 at 8.

## PROCEDURAL BACKGROUND

On October 21, 2016, after exhausting his administrative remedies with the federal government's Equal Employment Opportunity Commission, *see* ECF No. 46-10 at 1–2, Plaintiff filed suit in this Court against Defendant alleging that he suffered race discrimination, retaliation, and wrongful termination in his employment with Defendant, ECF No. 1. Specifically, Plaintiff alleged that he was subjected to a hostile work environment based upon several comments from coworkers related to his race and the actions of his supervisors and that he was fired in retaliation for engaging in the protected activity of filing his discrimination complaint.[6] *Id.*

---

[6] On May 25, 2017, Defendant moved for judgment on the pleadings (ECF No. 28), and on July 31, 2017, after considering the motion along with an opposition and reply (ECF Nos. 29–30), this Court denied Defendant's motion for judgment on the pleadings (ECF No. 33).

On October 2, 2017, Defendant filed its Motion (ECF No. 45) seeking summary judgment against Plaintiff for his claims of hostile work environment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the MHRA.[7] On November 3, 2017, Plaintiff filed an opposition (ECF No. 46), and Defendant filed a reply (ECF No. 47) on November 20, 2017. This matter is now fully briefed and the Court has reviewed Defendant's Motion as well as the responses thereto. For the foregoing reasons and pursuant to Federal Rule of Civil Procedure 56(a), Defendant's Motion (ECF No. 45) will be granted.

## STANDARD OF REVIEW

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Supreme Court has clarified that not every factual dispute will defeat a motion for summary judgment but rather, there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphases in original)). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party seeking summary judgment bears the initial burden of

---

[7] On March 31, 2017, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302 of the United States Court for the District of Maryland and upon consent of the parties, this case was transferred to United States Magistrate Judge A. David Copperthite for all proceedings.

either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322–24. If that burden has been met, the nonmoving party must then come forward with specific material facts that prove there is a genuine dispute for trial. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87.

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 249). Thus, "to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Moss v. Parks Corp.*, 985 F.2d 736, 738 (4th Cir. 1993) (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)).

## DISCUSSION

Defendant argues that it is entitled to summary judgment because Plaintiff has failed to establish a *prima facie* case for his hostile work environment and retaliation claims. Specifically, regarding the hostile work environment claims, Defendant contends that Plaintiff cannot prove that Plaintiff was subject to unwelcome conduct that was severe and pervasive enough to create a hostile work environment and that liability cannot be imputed to Defendant as his employer. ECF No. 45-1 at 12. Regarding the retaliation claim, Defendant argues that Plaintiff's instances of alleged retaliation did not result in any adverse employment action and that his termination was not causally connected to any protected activity. *Id.* at 20, 22. For the reasons below, the Court will grant Defendant's Motion.

## A. Defendant Is Entitled To Summary Judgment As To The Racially Hostile Work Environment Claims.

Title VII renders it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (2017). An employer contravenes § 2000e–2(a)(1) by requiring an African–American employee to work in a racially hostile environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986). A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). To prevail on a Title VII claim that a workplace is racially hostile, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (internal quotation marks and citation omitted).

Defendant raises two reasons why the Court should grant its Motion on the hostile work environment claims. First, Defendant contends that Plaintiff cannot prove that the alleged conduct was sufficiently severe or pervasive enough to alter the conditions of his employment and create a hostile work environment. ECF No. 45-1 at 1. Second, Defendant argues that Plaintiff cannot establish that the harassment is imputable to it as Plaintiff's employer. ECF No. 45-1 at 1. To grant Defendant's Motion, the Court need only find that Plaintiff cannot prove at least one element of his claim.

A hostile work environment claim requires a showing that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *See Harris*, 510 U.S. at 22 (citing *Meritor*, 477 U.S. at 67). Whether the environment is objectively hostile is "judged from the perspective of a reasonable person in the plaintiff's position," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and "we look to the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,'" *Okoli*, 648 F.3d at 220 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). Thus, the test is whether a reasonable jury could find that the conduct was severe enough to engender a hostile work environment. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280–81 (4th Cir. 2015). "This is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22.

Viewing the facts in the light most favorable to Plaintiff, Plaintiff suffered six incidents over about three months: (1) on May 20, 2014, Mr. Tomaskovic said, "Rudy, I swear to fucking God, if you have that heater on, I am going to kick your black ass," and repeated this statement in a way that made Plaintiff fear that Mr. Tomaskovic would physically harm him; (2) in April 2014, Ms. Junis said to Plaintiff, "Rudy, since the power is out, I cannot see you; you are too black;" (3) that in March 2014, Ms. Junis shouted that "black people don't look good in camouflage;" (4) that Ms. Junis shouted at Plaintiff that "black people don't celebrate Saint Patrick's Day;" (5) in early March 2014, Mr. Tomaskovic said to a coworker's dog, Jade, "[L]ook out Jade, there is a black man coming;" and (6) on February 25, 2014, Mr. Tomaskovic told Plaintiff that instead of hiring him, he wanted to "hire this smoking hot, white young lady." ECF Nos. 45-5 at 5–6 & 45-6 at 8–9. Additionally, Plaintiff testified that in or around mid-June,

16

he found "a picture of a noose and the 'N' word on a napkin" in his desk drawer at Old Montgomery Road. ECF No. 46-3 at 23. It is puzzling to the Court why Plaintiff, in the midst of his hostile work environment claim, would discard an alleged piece of discriminatory evidence and not express a heightened sense of danger over such an occurrence. Instead, Plaintiff testified he simply threw it away. This calls into question whether Plaintiff's report of feeling threatened was real or not.

Contrary to cases where this Court has concluded that a reasonable jury could not find that a hostile work environment existed, the comments Plaintiff alleges were race-based and in some instances threatened physical harm, which Plaintiff subjectively perceived as genuine. *Cf. Williams v. Balt. Cty., Md.*, No. ELH-13-3445, 2016 WL 3745980, at \*24–25 (D.Md. Mar. 11, 2016) (finding that a reasonable person could not conclude that Plaintiff's supervisors created a hostile work environment where, among other things, there were no derogatory comments or physically threatening conduct); *Howerton v. Bd. of Educ. of Prince George's Cty.*, TDC-14-0242, 2015 WL 4994536, at \*15–16 (D.Md. Aug. 19, 2015) (same). Thus, the evidence presented in the light most favorable to Plaintiff poses a close question of whether a reasonable jury could conclude that the alleged incidents collectively "created an environment where 'the workplace is permeated with discriminatory intimidation, ridicule, and insult' that was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Williams*, 2016 WL 3745980, at \*24 (quoting *Boyer-Liberto*, 786 F.3d at 277).

Assuming *arguendo* that Plaintiff has met his burden to set forth facts upon which a reasonable jury could find that the alleged incidents were severe enough to engender a hostile work environment, Defendant is entitled to summary judgment on the hostile work environment

claims because the alleged incidents are not imputable to Defendant as Plaintiff's employer and the remedial actions by Defendant were legally sufficient to eliminate a hostile work environment.

Defendant contends that Mr. Tomaskovic and Ms. Junis were not Plaintiff's supervisors such that liability for their alleged unlawful conduct could not be imputed to Defendant as a matter of law. ECF No. 45-1 at 15–16. Alternatively, Defendant contends that even if Defendant had supervisory authority over Plaintiff, it cannot be held vicariously liable for Ms. Junis's and Mr. Tomaskovic's acts pursuant to the affirmative defense set forth by the Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), which requires Defendant to demonstrate, first, that it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior" and, second, that Plaintiff "unreasonably failed to take advantage of preventative or corrective opportunities . . . or to avoid harm otherwise." *Id.* at 16–17.

The parties agree that Defendant adopted and distributed an anti-harassment policy, which "provides compelling proof that the company has exercised reasonable care in preventing [racial] harassment," but "[t]he mere presence of an anti-discrimination policy . . . does not end the [c]ourt's inquiry." *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F.Supp.3d 398, 414 (D.Md. 2015). The status of the harasser is also relevant to determining whether harassment is imputable to an employer. "On the one hand, 'if the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.'" *Boyer-Liberto*, 786 F.3d at 278 (quoting *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439 (2013)). However, "where the harasser is the victim's supervisor, 'different rules apply': The employer is strictly liable for the supervisor's harassing behavior if it 'culminates in a tangible employment

18

action,' but otherwise 'may escape liability by establishing, as an [*Ellerth/Faragher*] affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.'" *Id.* (quoting *Vance*, 133 S.Ct. at 2439). "[A] plaintiff seeking to impute liability to [his] employer for harassment by a co-worker may not be able to establish the employer's negligence if [he] did not report the harassment." *Id.*

"[T]he harasser qualifies as a supervisor, rather than a co-worker, 'if he or she is empowered by the employer to take tangible employment actions against the victim.'" *Id.* (quoting *Vance*, 133 S.Ct. at 2439). "Tangible employment actions" means those that "effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Vance*, 133 S.Ct. at 2443). Thus, "a supervisor has the 'authority to inflict direct economic injury.'" *Id.* (quoting *Vance*, 133 S.Ct. at 2448).

Viewing the facts in the light most favorable to Plaintiff, Plaintiff properly reported the alleged harassing behavior. Plaintiff, however, offers no evidence that Mr. Tomaskovic, the operational superintendent of LPWRP, or Ms. Junis had the "authority to inflict direct economic injury" upon him. Furthermore, Plaintiff never suggested that Mr. Tomaskovic or Ms. Junis could fire him or otherwise had the power to change his employment. *Cf. id.* at 279–80 (determining that when an employee portrayed her authority such that a reasonable person would believe that she had the power to fire Plaintiff or influence such a decision, that employee was deemed to have been Plaintiff's supervisor). Instead, Plaintiff testified that Mr. Tomaskovic's authority over him merely extended to assigning him payroll assignments, a normal part of Plaintiff's employment. *See* ECF No. 46-3 at 5. For purposes of Title VII, it does not matter

whether Plaintiff thought of Mr. Tomaskovic and Ms. Junis as supervisors because they simply were not supervisors within the meaning of Title VII. Accordingly, Mr. Tomaskovic and Ms. Junis are properly characterized as coworkers for purposes of this analysis.

Because the alleged harassment involved coworkers, Defendant's liability depends upon what it knew or should have known, and whether it responded with appropriate remedial action. Here, the parties agree that Defendant knew about Mr. Tomaskovic's and Ms. Junis's alleged statements once Plaintiff reported those statements on May 20, 2014. Furthermore, in the light most favorable to Plaintiff, he reported finding a napkin with "a picture of a noose and the 'N' word" to Dr. Gray, although Dr. Gray does not remember the napkin and did not mention it in any of her investigative reports. ECF Nos. 45-3 at 24 & 46-6 at 16; *see also* ECF No. 45-6 at 11–12. In taking remedial actions following Plaintiff's initial complaint against Mr. Tomaskovic, Ms. Madison, an African-American, reported Plaintiff's complaints to Mr. Gerwin, who contacted HR. ECF No. 45-4 at 4, 6. Ms. Madison and Mr. Gerwin asked Plaintiff to provide a written complaint for HR, pursuant to the formal complaint procedure in Defendant's Workplace Harassment Policy. ECF Nos. 45-3 at 10–12 & 45-10 at3–4.

Once HR received the written complaint, Dr. Gray, the Senior HR Administrative Analyst and an African-American, conducted an investigation and as a result of her investigation, Defendant disciplined Mr. Tomaskovic through a five day suspension without pay. ECF No. 46-13 at 2–4. Additionally, during and pending its investigation, Defendant arranged for Plaintiff to work at another one of its locations in order to address Plaintiff's concerns for his safety at LPWRP. ECF Nos. 45-3 at 12 & 45-5 at 9. Defendant also made efforts to switch personnel between LPWRP and Old Montgomery Road so that Plaintiff could stay at Old

Montgomery Road, ECF No. 46-3 at 17, and to move Plaintiff to a trailer office located at LPWRP, but these plans ultimately did not work, *see* ECF No. 45-6 at 6.

Several months after Mr. Tomaskovic's suspension, Defendant decided to transfer Plaintiff back to LPWRP, but in a different building from Mr. Tomaskovic. Plaintiff believed that he would be in danger at LPWRP and expressed his fear to Mr. Gerwin, Mr. Robbins, and Ms. Gray. ECF No. 45-3 at 17. Shortly thereafter, Ms. Gray discussed the possibility of Plaintiff transitioning into an opening for an Administrative Technician II position at a third Bureau location and because Plaintiff was at a higher grade than this position, Mr. Robbins and Ms. Gray decided to not downgrade Plaintiff if he filled this position. ECF No. 46-7 at 4–5. Thus, Mr. Robbins offered Plaintiff the opportunity to interview for the Administrative Technician II position as a lateral transfer, ECF Nos. 45-3 at 16 & 45-4 at 16 & 45-8 at 3, and Ms. Gray later reiterated this offer to Plaintiff, ECF No. 45-8 at 3–4. Plaintiff, however, stated that he did not wish to interview for the position. ECF No. 45-4 at 16.

Furthermore, Plaintiff complained of retaliation by his supervisors, Ms. Madison and Mr. Gerwin, on August 28, 2014 and he officially made a complaint on September 16, 2014. ECF Nos. 45-4 at 15 & 45-8 at 3. Mr. Gerwin contacted HR regarding Plaintiff's complaint and Dr. Gray immediately began conducting a separate second investigation. ECF No. 45-6 at 25. After interviewing seven people, Dr. Gray submitted her report, which found no evidence of retaliation by Ms. Madison and Mr. Gerwin against Plaintiff. *Id.* at 32. Defendant also brought in an outside consultant to investigate Plaintiff's complaint, whose findings did not differ from Dr. Gray's. ECF No. 46-3 at 19, 40.

Once Defendant completed its investigation into Plaintiff's September 16 retaliation complaint against his supervisors, Mr. Gerwin told Plaintiff that he would return to LPWRP, but

in a different building than before. ECF No. 45-3 at 18, 22. Plaintiff "reiterated [his] safety concerns and [his] anxiety for going back and working around [Mr.] Tomaskovic" because even though he would be in a different building from Mr. Tomaskovic at LPWRP, he would still interact with Mr. Tomaskovic and "see him basically every day" because of his payroll duties. *Id.* at 18, 22–23. Defendant advised Plaintiff that the conditions were safe and to report for work at the new building at LPWRP.

"[T]he reasonableness of a company's action depends, in part, on the seriousness of the underlying conduct." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015). Defendant's response to Plaintiff's complaints conveyed the seriousness with which Defendant viewed the situation, including its prompt reporting of the alleged incident to HR by Plaintiff's African-American supervisor, the prompt investigation of the incident by an African-American HR professional, and the suspension of the harasser because his comment—although not severe, extensive, or widespread enough to substantiate a violation of the workplace harassment policy—was nonetheless demeaning and insensitive. ECF No. 45-6 at 12; *see Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997) ("[A] good faith investigation of alleged harassment may satisfy the 'prompt and adequate' response standard, even if the investigation turns up no evidence of harassment." Such an employer may avoid liability even if a jury later concludes that in fact harassment occurred. (internal citation omitted)). Moreover, Plaintiff offers no alternative remedial steps which Defendant could have followed, except that Plaintiff wished to remain at Old Montgomery Road, seemingly indefinitely, because he thought that he would not be safe anywhere at LPWRP. Mr. Gerwin, Dr. Gray, and others, however, realized the challenge of having a timekeeper who was not located on-site. In order to best address Plaintiff's concerns while still getting him to most effectively perform his job, Defendant

decided to send Plaintiff to a safe location at LPWRP, away from his alleged former harasser. Moreover, Plaintiff had been offered an opportunity to interview for a new job with no loss in pay and at a third location (not LPWRP or Old Montgomery Road), and Plaintiff rejected that offer. Defendant took prompt remedial action to alleviate the harassment and Plaintiff failed to take advantage of the opportunity to remain employed.

Based on all of the actions Defendant took in response to Plaintiff's harassment complaint, a responsible jury could not find that Defendant's response was inadequate or unreasonable. *See Spicer v. Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995) ("[The Fourth Circuit] ha[s] consistently held that an employer is only liable for . . . harassment committed by its employees if no adequate remedial action is taken.") To the contrary, the parties agree that Defendant promptly investigated Plaintiff's complaints. A reasonable juror could not conclude that Defendant did not take adequate measures to assuage Plaintiff's concerns for his safety because, as a matter of law, Defendant's response "was reasonably calculated to end the harassment." *Williams*, 86 F.Supp.3d at 415 (quoting *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999)); *see EEOC*, 639 F.3d at 672 (holding that employer's response to racial harassment complaints, including employee counseling, disciplinary action, suspensions of two employees, and warnings that future misconduct could result in progressive discipline, was prompt, proportional to the seriousness and frequency of the various offenses, and employed 'increasingly progressive measures to address the harassment' that had occurred in the workplace") (citation omitted).

The following facts are uncontradicted:

- Defendant had a policy and procedure in place regarding workplace discrimination;
- Plaintiff's supervisor, Ms. Madison, is African-American;

- Ms. Junis and Mr. Tomaskovic are both coworkers and not supervisors;

- Plaintiff did not provide Defendant notice of any facts to support a hostile work environment based upon race until the May 20 incident with Mr. Tomaskovic;

- Plaintiff never previously complained of any other conduct, including all of the comments made by coworker Ms. Junis, the prior dog comment by Mr. Tomaskovic, and Mr. Tomaskovic's wanting to hire a smoking hot white lady before May 20;

- Defendant immediately began an appropriate investigation after Plaintiff notified his supervisor on May 20;

- Defendant included all of the conduct in its investigation even though Plaintiff never provided notice of almost all of the facts until May 20;

- Plaintiff was immediately moved from LPWRP after voicing his concerns for his safety and was allowed to continued working at Old Montgomery Road until after the investigation was complete;

- The investigation was conducted by an HR official, Dr. Gray, who was also an African-American employee;

- Mr. Tomaskovic was promptly disciplined by receiving a five day suspension without pay for inappropriate comments even though no hostile work environment was established;

- Plaintiff rejected any apologies offered by Mr. Tomaskovic and Defendant;

- A second immediate investigation was conducted by Dr. Gray after Plaintiff notified Mr. Gerwin that he (Plaintiff) believed Mr. Gerwin retaliated against him and did not like him and that Ms. Madison retaliated against him as well;

- After Plaintiff rejected being moved to a different building at LPWRP, Defendant offered Plaintiff an opportunity to interview for a new job with no loss of pay at a third location that was neither LPWRP or Old Montgomery Road and Plaintiff rejected that offer; and

- Defendant made multiple efforts to have Plaintiff return to the workplace in an environment that was safe, including an opportunity to interview at a third location.

Considering the facts most favorable to Plaintiff, Defendant took prompt and appropriate remedial action to end the harassment. The Court is mindful that an argument could be made that the issue of whether Defendant's remedial conduct was "reasonable" should be one for the jury due to the physical threat Plaintiff alleges resulted from Mr. Tomaskovic's heater remarks. However, Defendant offered Plaintiff an opportunity to interview for a new job with a new supervisor at a third location without any loss of benefits and where he would have no contact with Mr. Tomaskovic, and Plaintiff declined the interview. The Court is convinced that Defendant's remedial actions were legally appropriate to eliminate any hostile work environment and remove that issue from the trier of fact. Therefore, Defendant is entitled to summary judgment as a matter of law on the hostile work environment claims.

### B. Defendant Is Entitled To Summary Judgment On The Retaliation Claim.

Title VII prohibits retaliation against an employee because the employee has "opposed" an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). A retaliation claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550–51 (4th Cir. 2006). Under that framework, if Plaintiff states a *prima facie* case of retaliation, the burden shifts to Defendant to show that it had a legitimate, non-retaliatory reason for its contested action. *See id.* at 551. If

Defendant makes such a showing, the burden then shifts back to Plaintiff to show that the stated reason was pretextual and that retaliation was the "actual reason" for the contested action. *See Foster v. Univ. of Md.—E. Shore*, 787 F.3d 243, 253–54 (4th Cir. 2015).

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove that "(1) the plaintiff engaged in a protected activity . . . ; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli*, 648 F.3d at 223 (quoting *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). An adverse employment action is "any retaliatory act or harassment if that act or harassment results in an adverse effect on the terms, conditions, or benefits of employment." *Ensko v. Howard Cty., Md.*, 423 F.Supp.2d 502, 509 (D.Md. 2006) (citations omitted). Notably, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F.Supp.2d 729, 738 (D.Md. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Even under the "lower bar" applicable to Title VII retaliation claims, "none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an 'Attendance Warning,'' 'a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F.Supp.2d 480, 492 (D.Md. 2013) (quoting *Rock v. McHugh*, 819 F.Supp.2d 456, 470–71 (D. Md. 2011)); *see also Parsons v. Wynne*, 221 F.App'x 197, 198 (4th Cir. 2007) (plaintiff unable to establish *prima facie* case of retaliation based on reassignment and imposition of alternative work schedule). "[A]s to the third element, both this Court and the United States Court of Appeals for the Fourth Circuit have

held that proximity in time between the protected activity and the adverse employment action may be sufficient to establish the causation requirement." *McGrath-Malott v. Maryland*, 565 F.Supp.2d 656, 671 (D.Md. 2008). Moreover, this causation requirement "requires [the plaintiff] to demonstrate not only a causal connection between his opposition and his termination, but that his opposition was the 'but for' cause of that termination." *Noel v. United Parcel Serv., Inc.*, PWG-13-1138, 2014 WL 4452667, at *8 (D.Md. Sept. 9, 2014) (citation omitted).

There is no question that Plaintiff engaged in protected activity by filing his complaints against Mr. Tomaskovic, Mr. Gerwin, and Ms. Madison. Defendant challenges, however, whether, based on the factual record construed in the light most favorable to Plaintiff, Plaintiff has shown an adverse employment action, aside from his termination, or that he was terminated because he engaged in protected activity. ECF No. 45-1 at 2.

The Court agrees with Defendant that out of all of Plaintiff's alleged retaliatory actions, including the change of Plaintiff's work duties when he was asked to take pictures of work sites, Plaintiff's lack of access to a computer for two weeks, and his termination, ECF No. 46 at 18, only Plaintiff's termination constitutes an adverse action.[8] Plaintiff relies on *Armstrong v. Index Journal Co.*, 647 F.2d 441 (4th Cir. 1981), and analogizes the adverse action in that case with the alleged adverse actions in this case. *Id.* at 19. Such reliance, however, does not help Plaintiff. In *Armstrong*, the Fourth Circuit held that an employee's termination was not the result of her

---

[8] In the alternative, Plaintiff argues that he was constructively discharged, which constitutes an adverse employment action. ECF No. 46 at 22. Plaintiff's argument, however, fails. Here, in the light most favorable to Plaintiff, Plaintiff was told that if he did not return to LPWRP, then he would be terminated. ECF No. 45-3 at 18. Plaintiff decided to not return to LPWRP and went on leave. *Id.* at 20. Once Plaintiff's leave was all used, at Plaintiff's request, Defendant terminated Plaintiff. A constructive discharge requires that Plaintiff have resigned. *Green v. Brennan*, 136 S.Ct. 1769, 1777 (2016) (citation omitted). That did not happen here because Plaintiff never expressed that he wished to resign. Instead, Plaintiff expressly went on leave and asked that Defendant send him termination paperwork for his insubordination, which it eventually did.

27

refusal to work on an account which provided less compensation than the accounts provided to her male colleagues, but rather her complaints about unlawful employment practices—namely, the disparity between her pay and that of her male colleagues, which constituted protected activity. 647 F.2d at 448–49. Unlike *Armstrong*, Plaintiff's refusal to move to a different building at LPWRP is not related to any unlawful employment practice by Defendant. *See id.* at 448 (stating that Title VII was "not intended to immunize insubordinate, disruptive, or nonproductive behavior at work" and that an employer must retain the power to discipline and discharge disobedient employees).

Plaintiff acknowledges that his termination resulted from his refusal to work at any building at LPWRP. *See* ECF No. 46 at 20. Defendant even offered Plaintiff an opportunity to interview for a new job at a third location. Plaintiff also proffers that his termination resulted from his complaints against Mr. Tomaskovic and his supervisors which occurred about twenty-three and seven weeks before his termination, respectively. The *prima facie* case stage merely requires that Plaintiff provide sufficient evidence to support an inference of causation and the closeness in time between Plaintiff's complaint against his supervisors and his termination meets this burden. *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding inference of causation where termination occurred within two and a half months of employer receiving notice of employee's EEOC filing); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (finding that an adverse employment action that occurred six weeks after the plaintiff's protected activity was sufficient to support an inference of causation for purposes of establishing a *prima facie* case of retaliation). Plaintiff's complaint against Mr. Tomaskovic, however, was not causally connected to his termination because a significant lapse of time passed between this complaint and Plaintiff's termination. *See Pascual v. Lowe's Home Ctrs., Inc.*, 193 F.App'x 229, 233 (4th Cir.

2006) (finding no causal connection where three to four months passed between claimed protected activities and termination). Even assuming a causal connection, Plaintiff's termination was the result of his own insubordination resulting from his failure to return to work under any conditions offered. His termination was at his own request.

Assuming *arguendo* that Plaintiff has established a *prima facie* case of retaliation as to his complaint against his supervisors, the burden shifts to Defendant to show that it had a legitimate, non-retaliatory reason for terminating Plaintiff. This is a burden of production, not persuasion, meaning that Defendant merely has to provide evidence demonstrating that the removal from duty was not in retaliation for Plaintiff's complaint. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). Defendant easily carries this burden because it produced evidence that Plaintiff was terminated for his prolonged absence when he exceeded the time allowed for leave and failed to report for work.

With Defendant carrying its burden of producing evidence of a legitimate, non-retaliatory reason for terminating Plaintiff, the burden shifts to Plaintiff to show that Defendant's explanation is pretextual. To show pretext Plaintiff must demonstrate that were it not for Defendant's desire to retaliate against him for his complaint, he would not have been terminated. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013) (holding that Title VII claims of retaliation require a showing of "but-for causation," meaning a plaintiff must provide "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"). To do so, Plaintiff must present evidence that (1) Defendant's reason for terminating him was false; and (2) retaliation for his complaint was the real reason for his termination. *See Foster*, 787 F.3d at 252. As a practical matter, the burden to show pretext "merge[s] with the ultimate burden of persuading the court" that the plaintiff has

been the victim of unlawful retaliation, which Plaintiff can accomplish by showing that Defendant's proffered explanation is "unworthy of credence." *Holland*, 487 F.3d at 214 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

On summary judgment, Plaintiff need only present evidence sufficient to establish a genuine issue of material fact on whether Defendant's reason for terminating his employment was pretextual. Even viewing the evidence in the light most favorable to Plaintiff, he has not met this standard. Plaintiff does not dispute that he refused to work at any building at LPWRP or potentially the third location and requested that he be placed on leave until he was "written up, for insubordination, as well as being terminated." ECF No. 45-3 at 30. Plaintiff acknowledged his insubordination, and a reasonable jury could not find that Plaintiff's protected activity of filing complaints was the "but for" cause of his termination. Plaintiff provides no evidence other than temporal proximity to connect his termination to his complaints. Notably, Plaintiff wasn't terminated in the immediate aftermath of his complaints, but rather after his complaints were investigated and resolved by HR and Plaintiff refused to return to work.

Defendant has put forth evidence of a legitimate non-retaliatory basis for terminating Plaintiff and Plaintiff has failed to present any evidence sufficient to refute it or otherwise establish a genuine issue of material fact on causation, the Court grants Defendant's Motion on Plaintiff's retaliation claim under both Title VII and the MHRA. *See Chappell v. S. Md. Hosp., Inc.*, 578 A.2d 766 (Md. 1990) (stating that because the MHRA tracks the language of Title VII, the same criteria apply in analyzing retaliation claims under either statute).

At bottom, Defendant took reasonable action to investigate Plaintiff's complaints, took adequate remedial measures to eliminate the hostile environment, and once Defendant received the allegation of retaliation, once again investigated the allegation and offered reasonable

solutions. Those solutions included moving Plaintiff to a different building at LPWRP and even interviewing Plaintiff for a new job at a new third location with no loss of pay. Plaintiff rejected the offers and instead requested that he be terminated for failing to return to work after his leave was exhausted. It was Plaintiff's choice not to return to work that caused his firing. There is no evidence whatsoever in the record that Defendant retaliated against Plaintiff for engaging in protected activities. Defendant is entitled to judgment as a matter of law on the claim of retaliation.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court finds that, in the light most favorable to Plaintiff, there is insufficient evidence from which a jury could find in Plaintiff's favor on the hostile work environment and retaliation claims. Therefore, pursuant to Rule 56, Defendant's Motion (ECF No. 45) is GRANTED.

A separate order will follow.

Date: 19 December 2017

A. David Copperthite
United States Magistrate Judge